(No. 55816.—

CHARLES F. MOEHLE, Adm'r *et al.*, Appellants, v.
CHRYSLER MOTORS CORPORATION, Appellee.

*Opinion filed December 17, 1982.*

GOLDENHERSH, WARD, and MORAN, JJ., dissenting.

Edward J. Egan, of Edward J. Egan, Ltd., and Robert J. Weber, of Robert J. Weber, Ltd., both of Chicago, for appellants.

Cassiday, Schade & Gloor, of Chicago (William J. Furey, Bradford D. Roth, Michael J. Gallagher, and Timothy J. Ashe, of counsel), for appellee.

JUSTICE SIMON delivered the opinion of the court:

This is a strict product liability action in which damages are sought for injuries suffered by Noma L. Meister and Margaret M. Moehle in an accident involving an automobile manufactured by the defendant, Chrysler Motors Corporation. Charles F. Moehle and Mrs. Meister brought the action in the circuit court of Cook County, Mr. Moehle bringing it in his capacity as administrator of his deceased wife's estate.

The accident occurred when Mr. Moehle was driving his Chrysler New Yorker automobile on a four-lane highway at 40 to 50 miles per hour and struck another automobile which had suddenly swerved and entered his lane while crossing the highway. Mrs. Moehle and Mrs. Meister were sitting in the rear seat with their seat belts fas-

tened. As a result of this accident, both of them were seriously injured, especially in the abdominal area. Mrs. Moehle died from these injuries, and Mrs. Meister was hospitalized for many weeks.

The evidence presented at trial is set forth fully in the appellate court's opinion (100 Ill. App. 3d 353, 354-58), and therefore we will limit our discussion here to a brief exposition of the plaintiffs' theory of strict liability. The plaintiffs alleged that Chrysler's rear-seat-anchoring system was dangerously defective and that this defect caused the severe abdominal injuries to the passengers in the rear seat of the Moehle automobile. The anchoring system in question consisted of two Z-shaped wires located underneath the left and right side of the seat. One end of each wire was attached to the underside of the seat, while the other end was attached to a floor-mounted bracket. This bracket had two hooks that wrapped around the Z-shaped wire, thereby restraining the seat's movement. Plaintiffs argued that as a result of the collision the rear seat shifted sideways from the right to the left. This movement, plaintiffs contended, caused the Z-shaped anchoring wire to become unfastened from the hooks on the floor-mounted bracket. Once the anchoring wire was disengaged, the rear seat could move forward freely. Plaintiffs' theory is that the rear seat dropped downward as a result of this movement. The combination of the forward and downward seat movement made the passengers slide under their seat belts and caused the belts to impact them in the soft abdominal region rather than in the harder pelvic region where the impact might have resulted in less severe injuries.

Chrysler responded that the Z-shaped anchoring wire did not disengage; that even if it did disengage the rear seat would be unable to move forward; and that even if the wire did disengage and the seat moved forward, the

anchoring system was not unreasonably dangerous. Chrysler also offered evidence that the injuries were caused not by movement of the rear seat but by normal body responses in a high-speed collision. The jury rendered a verdict in Chrysler's favor. The circuit court entered a judgment consistent with the verdict, and the appellate court affirmed. (100 Ill. App. 3d 353.) In their appeal to this court, the plaintiffs object to the admission of Federal Motor Vehicle Safety Standard No. 207, and also contend that the jury's verdict was against the manifest weight of the evidence.

Plaintiffs argue that the trial court erred in admitting evidence that Chrysler's rear-seat-anchoring system complied with the Federal safety standard. This standard required that seat-anchoring systems be able to withstand longitudinal forces of 20 times the weight of the seat. An expert witness testified on behalf of Chrysler that the anchoring system actually exceeded the Federal standard, having been tested under crash conditions to 24 times the weight of the seat.

Chrysler argues that the plaintiffs did not properly preserve their objection to the admission of the evidence concerning Chrysler's compliance with the Federal safety standard, and that the issue, therefore, is not before this court for review. Issues raised for the first time on appeal may not normally be considered by the appellate court. (*Snow v. Dixon* (1977), 66 Ill. 2d 443, 453, *cert. denied* (1977), 434 U.S. 939, 54 L. Ed. 2d 298, 98 S. Ct. 429; *People ex rel. Wilcox v. Equity Funding Life Insurance Co.* (1975), 61 Ill. 2d 303, 313.) In this case, however, the plaintiffs argue that they objected to the admission of the safety-standard evidence at an *in camera* conference and that this objection properly preserved the issue for appeal. Because we believe that the Federal safety standard was properly admitted, we need not decide whether the plaintiffs' *in camera* objection

was sufficient to preserve the issue for appeal.

In *Rucker v. Norfolk & Western Ry. Co.* (1979), 77 Ill. 2d 434, 436-40, this court held that evidence of a product's compliance with governmental safety standards is relevant and admissible in a product liability case on the issues of whether the product is defective and whether a defect in the product is unreasonably dangerous. Plaintiffs concede that *Rucker* required the trial court to admit the safety-standard evidence in this case, but they urge us to abandon or modify *Rucker*.

Absent compelling reasons for so doing, we are reluctant in a civil case to abandon or modify an earlier decision of this court so soon after its adoption. The People and the bar of this State are entitled to rely upon our decisions with assurance that they will not be lightly overruled. (*Graham v. General U.S. Grant Post No. 2665, V.F.W.* (1969), 43 Ill. 2d 1, 8; *Chicago Title & Trust Co. v. Shellaberger* (1948), 399 Ill. 320, 343.) Other cases have been tried or disposed of on appeal in reliance on *Rucker*, and we should not announce a rule contrary to the results reached in those cases without good cause. (*E.g., Hubbard v. McDonough Power Equipment, Inc.* (1980), 83 Ill. App. 3d 272, 274; *Turney v. Ford Motor Co.* (1981), 94 Ill. App. 3d 678, 685.) Of course, we must modify our rules concerning the admissibility of evidence when we determine through experience that they undermine the truth-seeking process or prejudice other important public interests. However, we have no indication that the rule established in *Rucker* has had any of these effects.

Plaintiffs argue that a jury may tend to overemphasize evidence of a manufacturer's compliance with governmental safety standards and that in some cases antiquated or grossly minimal safety standards may tend to confuse or mislead the jury concerning the availability of safety technology. We do not find this argument persua-

sive. With careful instructions to the jury by the trial judge and with effective argument by plaintiff's counsel we believe that the jury can properly evaluate the importance of the safety-standard evidence and then weigh it with all the other evidence in the record.

The decision in *Rucker* expressly announced that safety-standard evidence is not conclusive on the issues for which it may be presented. "The finder of fact may conclude that a product is in an unreasonably dangerous defective condition notwithstanding its conformity to Federal standards" (*Rucker v. Norfolk & Western Ry. Co.* (1979), 77 Ill. 2d 434, 440), and the jury may be so cautioned. Moreover, in instructing the jury the trial judge may avoid unnecessary highlighting of safety-standard evidence by following the approach of the trial judge in this case, who refused to submit Chrysler's proposed instruction on safety-standard evidence to the jury, presumably on the ground that it would have unnecessarily overemphasized the importance of that evidence.

The adversary process will also tend to diminish the misleading character of minimal or antiquated safety standards. As the plaintiffs did in this case, plaintiffs are free to dispute the importance of safety-standard evidence in deciding whether a product is defective or unreasonably dangerous. We believe that the jury is capable of giving the proper weight to this type of evidence, and for that reason *Rucker* should not be overruled without further experience with the type of evidence it permits to be introduced.

The plaintiffs also claim that the jury's verdict in favor of Chrysler was against the manifest weight of the evidence. The proper inquiry on this appeal is whether there is sufficient credible evidence in the record to support the jury's verdict in favor of Chrysler, not whether it would have been equally reasonable for the jury to have reached the contrary result. (*Lawson v. G. D. Sea-*

*rle & Co.* (1976), 64 Ill. 2d 543, 548; *Tweedy v. Wright Ford Sales, Inc.* (1976), 64 Ill. 2d 570, 575.) We find that the evidence in this case was sufficient for the jury to conclude that the rear-seat-anchoring system was not defective, or that it was not unreasonably dangerous, or that it was not the proximate cause of the injuries suffered by the two passengers in the rear seat. If the jury reached any one of these conclusions it was compelled to render a verdict in favor of Chrysler.

As noted above, plaintiffs argued that the Chrysler rear-seat-anchoring system was defective because under the conditions of the accident the Z-shaped anchoring wire could become disengaged from the floor-mounted bracket, thereby permitting the rear seat to move forward and drop down. The plaintiffs argued that the combination of this forward and downward movement caused Mrs. Meister and Mrs. Moehle to slide underneath their seat belts. As a result of this dangerous "submarining effect" their seat belts impacted them in the soft abdominal region instead of in the harder pelvic region, thus causing their serious abdominal injuries.

On the issue of the wire disengagement, John Marcosky, an engineer, testified for the plaintiffs that in his opinion the Z-shaped wire did become unfastened from the floor-mounted bracket. Mr. Marcosky based this testimony on a deformation of the right bracket and on scrape marks on the floor of the rear-seat area, both allegedly caused when the Z-shaped wire disengaged from the bracket. However, Leslie Parr, an expert witness for Chrysler, contradicted this testimony by observing that it would not have been possible for the wire to disengage from the anchoring bracket under the conditions of this accident and that in fact the deformation of the bracket actually made it less likely that the Z-shaped wire could have become unfastened. On the basis of this testimony the jury could have reasonably found that the Z-shaped

wire did not disengage and that the anchoring system therefore was not defective.

On the issue of the seat movement the evidence was conflicting. Mrs. Meister testified that she felt the rear seat moving backward and forward during the accident. Two witnesses at the scene of the accident testified for the plaintiffs that the seat seemed slightly ajar. A rescue crew member who inspected the vehicle several hours after the accident also testified that the back seat was pulled out several inches, although he had made an earlier statement that the rear seat looked "as good as the day it was new." Chrysler's expert witness, Leslie Parr, testified that even if the Z-shaped anchoring wire did disengage from the floor-mounted bracket, the rear seat would have been restrained by other parts of the automobile: the rear doors, the drive-shaft tunnel and the drive-shaft riser. Thus, Mr. Parr noted that the rear seat could not move forward without a deformation of the automobile's undercarriage, of which there was none here. Mr. Parr's testimony was supported by three witnesses who observed the rear-seat compartment of the Moehle automobile shortly after the accident. None of these witnesses observed any displacement of the rear seat. The jury's verdict for Chrysler, therefore, could reasonably have been based on the testimony of Chrysler's witnesses that the rear seat did not move. If the seat did not move, the jury was compelled to find that the anchoring system was not defective, or if defective was not unreasonably dangerous.

On the issue of proximate cause, Edward Moffatt, a biomechanical engineer, testified that seat belts are designed so that in an accident the automobile occupant will normally pivot around the seat belt with the belt impacting on the pelvis. Retention of the seat in its fixed position is essential for the proper operation of the seat belt, because the seat-ramp angle assists in steering the

occupant's body into a proper impact with the belt. When the seat collapses, Mr. Moffatt testified, a "submarining effect" occurs in which the occupant slides underneath the seat belt and the belt impacts the occupant's soft abdominal area, causing injuries of the type suffered by Mrs. Moehle and Mrs. Meister.

Chrysler's expert witness, Dr. Donald Huelke, contradicted all of Mr. Moffatt's testimony. Dr. Huelke testified that "submarining" refers to a phenomenon that was observed in crash testing done with a prior generation of anthropomorphic dummies which had unsophisticated pelvic structures. The effect is no longer observed in more realistic dummies. Moreover, he observed that when it occurs "submarining" is not necessarily related to seat-cushion movement and that the phenomenon can occur without such movement. Dr. Huelke also testified that other forces could cause the same pattern of injuries as those caused by "submarining" and that in fact it was his opinion that the injuries suffered by Mrs. Meister and Mrs. Moehle were simply caused by normal body responses in an impact with seat belts in a high-speed collision. If the jury believed Dr. Heulke's testimony, it could reasonably have concluded that a defect, if any, in the rear-seat-anchoring system did not proximately cause Mrs. Moehle's and Mrs. Meister's abdominal injuries.

In summary, we have not been furnished with adequate reason to overrule or modify *Rucker* so soon after its adoption. Nor are we persuaded upon our review of the record that the verdict in this case was against the manifest weight of the evidence.

The judgment of the appellate court is affirmed.

*Judgment affirmed.*

JUSTICE GOLDENHERSH, dissenting:

I dissent and would reverse the judgment and remand the cause for a new trial. As Justices Ward, Moran

and I pointed out in our dissent in *Woodill v. Parke Davis & Co.* (1980), 79 Ill. 2d 26, 38, and *Rucker v. Norfolk & Western Ry. Co.* (1979), 77 Ill. 2d 434, 441, in an action based on strict liability, evidence of the defendant's compliance with governmental requirements is irrelevant. The effect of the introduction of that type of evidence is to focus attention on the question whether the defendant was at fault. The question in a product liability case is not whether the defendant was at fault, but whether the product was defective. I agree with the majority that ordinarily there is, and properly should be, reluctance to modify an earlier decision soon after its adoption. But when the earlier decision is clearly and unmistakably erroneous, as was the decision in *Rucker*, it should be overruled as quickly as possible.

WARD and MORAN, JJ., join in this dissent.